UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: SILVIA MARIA DELCORSO,　　　:　　　No. 06-21459REF
　　　　　Debtor　　　　　　　　　　:　　　Chapter 7

## ORDER GRANTING MOTIONS OF UNITED STATES TRUSTEE FOR DISGORGEMENT OF FEES AND IMPOSITION OF SANCTIONS

AND NOW, this 27th day of December, 2007, upon my consideration of the United States Trustee's Motion for Disgorgement and Return of Fees Paid by Debtor (the "Disgorgement Motion") and her Motion for Sanctions Pursuant to Federal Rule of Bankruptcy Procedure 9011 (the "Sanctions Motion")(the Disgorgement Motion and the Sanctions Motion are referred to together herein as the "Motions"), which Motions seek both (i) the disgorgement of fees paid to Thomas L. Lightner, Esquire ("Mr. Lightner"), who was Debtor's original counsel in the above-captioned Chapter 7 case, and (ii) sanctions against Mr. Lightner, upon Mr. Lightner's response to the Motions, upon the testimony and exhibits offered and admitted in the hearing on the Motions on October 18, 2007, upon the briefs of the parties, and based upon the findings of fact, conclusions of law, and discussion in the accompanying Memorandum Opinion of even date,

IT IS HEREBY ORDERED that both of the Motions are GRANTED.

IT IS FURTHER ORDERED that Mr. Lightner is hereby directed and compelled to disgorge his fees received from Debtor in this case and to pay $1,155 to Debtor within ten (10) days of this Order.

1

IT IS FURTHER ORDERED that Mr. Lightner is hereby also directed and compelled to pay to Debtor, within ten (10) days of this Order, an additional $95 as a sanction for his conduct.

BY THE COURT

Richard E. Fehling
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: SILVIA MARIA DELCORSO          :          No. 06-21459REF
Debtor          :          Chapter 7

## MEMORANDUM OPINION

## I. INTRODUCTION

The instant matter arose upon the filing by the United States Trustee of two

motions, one seeking disgorgement of fees paid by Debtor, Silvia Maria DelCorso

("Debtor") to her original counsel in this case, Thomas L. Lightner, Esquire ("Mr.

Lightner"), and the other motion seeking sanctions against Mr. Lightner. Debtor had

transferred property from her name alone to herself and her husband immediately prior to

the filing of her petition in this case. The basis for the United States Trustee's motions

was Mr. Lightner's explicit advice and counsel to Debtor to transfer the property. The

United States Trustee claims it was a fraudulent transfer on the eve of Debtor's

bankruptcy. Mr. Lightner's fee was $1,155.[1]

Ten days before Debtor initiated her bankruptcy, she was the sole title

holder for the home in which she, her husband, and their family resided. Upon Mr.

---

[1] The total fee was comprised of $1,000 for Mr. Lightner's representation of Debtor in her
Chapter 7 bankruptcy and $155 for his preparation and filing of the deed transferring the
property.

1

Lightner's advice, counsel, and assistance, Debtor transferred the property nine days

before she filed for bankruptcy relief. Debtor performed the transfer through the

execution and recording of the deed for the home, transferring it from Debtor alone to

both Debtor and her husband as tenants by the entirety. As discussed more fully below, I

find that Mr. Lightner deliberately and intentionally advised and assisted Debtor in the

unlawful act of transferring property immediately prior to filing her bankruptcy.

I therefore grant, in the Order accompanying this Memorandum Opinion,

both of the motions of the United States Trustee. I will order Mr. Lightner to disgorge

and return to Debtor his fees of $1,155, and I will further sanction Mr. Lightner by

ordering him to pay to Debtor an additional $95.[2] My discussion below in this

Memorandum Opinion contains my findings of facts and my conclusions of the law in

this case.

## II.  PROCEDURAL BACKGROUND

Debtor filed her petition in this case under Chapter 7 on September 29,

2006. Mr. Lightner was her counsel and prepared her petition, statement of financial

affairs, schedules, and other necessary documents. The Chapter 7 Trustee examined

---

[2]The $95 sanction is intended to pay the Debtor for the fees that she paid to her new
counsel, which fee was $1,250 at the time of the hearing in this matter.

Debtor at her Section 341 initial creditors' meeting[3] on November 6, 2006, and asked her

if she had transferred any property prior to filing her bankruptcy. Debtor admitted that

she had done so and the Trustee initiated proceedings to recover the property for the

estate.[4] Debtor obtained new counsel, who entered his appearance on January 17, 2007,

replacing Mr. Lightner, and settled with the Chapter 7 Trustee in early March 2007. I

approved the settlement by my Order dated March 9, 2007. On May 8, 2007, the United

States Trustee moved for approval of a waiver by Debtor of her discharge. Debtor did not

oppose the waiver of discharge and I approved it by my Order dated May 31, 2007.

On September 17, 2007, the United States Trustee filed both her Motion for

Disgorgement and Return of Fees Paid by Debtor (the "Disgorgement Motion") and her

Motion for Sanctions Pursuant to Federal Rule of Bankruptcy Procedure 9011 (the

"Sanctions Motion"). (The Disgorgement Motion and the Sanctions Motion are referred

to together herein as the "Motions.") The factual averments in the Motions are almost

identical. Mr. Lightner filed his Answer to the Disgorgement Motion on September 24,

2007, but filed no response to the Sanctions Motion.

At the hearing on the Motions, held on October 18, 2007, counsel for the

---

[3]Section 341(a) of the Bankruptcy Code mandates an initial meeting between a trustee
and a debtor. All creditors and other parties in interest are permitted to attend the meeting and
question the debtor about the bankruptcy estate. 11 U.S.C. §341(a).

[4]On December 4, 2006, the Chapter 7 Trustee filed Trustee's Objection to Debtor's
Claimed Exemptions, and on December 15, 2006, the Trustee filed a complaint in an adversary
action seeking the recovery of property of the estate and the avoidance of a fraudulent transfer.

United States Trustee and Mr. Lightner agreed to consider Mr. Lightner's Answer to the

Disgorgement Motion as his response to the Sanctions Motion.  Both parties also agreed

that the hearings on the two Motions would be consolidated and that all testimony and

exhibits presented in the October 18, 2007 hearing would be admitted into evidence for

both the Disgorgement Motion and the Sanctions Motion.  At the close of the October 18,

2007 hearing, the parties agreed to a briefing schedule and the parties have filed their

briefs. This matter is now ripe for my determination.


## III.  FACTUAL BACKGROUND


### A.  Waiver of Attorney-Client Privilege

Both Debtor and her husband, Anthony DelCorso ("Mr. DelCorso"),

testified at some length about their various conversations with Mr. Lightner.  Counsel for

the United States Trustee notified both Debtor and Mr. DelCorso (together, the

"DelCorsos"), near the start of their testimony, that he would ask them questions about

their discussions and communications with Mr. Lightner.  Counsel asked them if they

would waive the attorney-client privilege prohibiting disclosure of such communications

and answer his questions.[5]   Both DelCorsos agreed, without any limitation, that they

---

[5]The attorney-client privilege is a cornerstone of an attorney's ability to represent a client
effectively because it encourages frank and open discussions between counsel and client.  Upjohn
Co. v. United States, 449 U.S. 383, 389 (1981).  See also Pennsylvania Rules of Professional
Conduct, Rule 1.6 and Comments [2] and [3].  This frank exchange is essential for an attorney's

4

waived the privilege.[6]  The waiver of the attorney-client privilege protecting communications between the DelCorsos on the one hand and Mr. Lightner on the other was openly, knowingly, and intelligently given.


## B.  Initial Financial Difficulties of Debtor and Her Husband Leading to Sale and Acquisition of Debtor's Homes

Beginning sometime in or before 2004, the DelCorsos experienced financial difficulties when Mr. DelCorso became disabled and Debtor was out of work while bearing and raising their three children.  They decided to sell their home at 4130 Crestview Drive, Stroudsburg, Pennsylvania (the "Stroudsburg home") and move to Florida.  The Stroudsburg home was titled in both of the DelCorsos' names as tenants by the entirety.  After signing an agreement for the sale of their Stroudsburg home, however, the DelCorsos reconsidered and wanted to remain in the Lehigh Valley because they have family and friends there.  The buyers of the Stroudsburg home refused to cancel the sale agreement to allow the DelCorsos to keep the Stroudsburg home.  The DelCorsos had only five days to find alternative housing.

---

full and accurate representation, because counsel must know about all facets and tangential information arising in or out of the matter that is the subject of the representation.  Only if a client is comfortable that none of the client's discussions with counsel will be divulged to others will a client freely provide all related information to counsel.

[6]The waivers of the privilege by the DelCorsos in this case were given in open Court with both their former counsel, Mr. Lightner, and their current counsel, P. Gregory Dolan, II, Esquire, present.  Neither counsel challenged or questioned the waiver.  Counsels' silence represented to me their consent to the waiver.

Within that five days, the DelCorsos found a suitable new home to buy at

4674 Maryann Drive, Bethlehem, Pennsylvania (the "Bethlehem home"), but could not

obtain traditional mortgage financing because of both (i) the very short time-frame and

(ii) Mr. DelCorso's financial difficulties.  Debtor and her husband agreed to use funds in

excess of $100,000, which were proceeds from the sale of their Stroudsburg home, as a

down payment on the Bethlehem home.[7]  They were also able to find a mortgage

company, Countrywide Home Loans ("Countrywide"), that would finance the purchase of

the Bethlehem home quickly, on certain express pre-conditions.  Because Debtor's

husband had a poor credit rating, Countrywide structured the financing as an immediate,

"no-doc" loan.[8]  But Countrywide would finance the purchase only if the Bethlehem

home were acquired by Debtor alone and only if the mortgage loan were made to Debtor

alone.  To satisfy Countrywide's requirements, therefore, Debtor acquired the Bethlehem

---

[7]This use of the funds from the sale of the Stroudsburg home by Debtor and Mr.
DelCorso constituted Mr. DelCorso's voluntary agreement to give the proceeds received from the
sale of the Stroudsburg home, which had been owned by the DelCorsos together as tenants by the
entirety, to Debtor to purchase the Bethlehem home in her name alone.

[8]Borrowers who might be interested in an explanation of a "no-doc loan" could find the
following typical description on the Internet (located by "googling" a search for "no doc loan").
Because this definition was not offered as evidence at the October 18, 2007 hearing, I present it
here for explanatory purposes only, it is not part of the record, but it may be helpful:

> No Doc loan requires no employment, income, or assets to be stated on your loan
> application. We do not verify any information beyond your credit profile and the value of
> the property. Our No Doc Loan lenders allow as little as a 5% down payment depending
> on your credit profile. This is the product of choice if your employment is difficult to
> verify or if you do not want the "hassle" of traditional mortgage documentation. Your
> good credit, a decent property, and we are done.

Internet site for Carteret Mortgage:  www.nva-mortgage.com/no_doc_loan.htm (Nov. 27, 2007).

6

home in her name alone and obtained the mortgage financing in her name alone.

Although the title to the Bethlehem home was in Debtor's name alone,

Debtor and her husband have regarded, at all times since 2004, the Bethlehem home as

their family home.  At least a portion of the monthly mortgage payment was and is

provided by Mr. DelCorso, who also provides or contributes to other household expenses,

maintenance, and repairs.


## C.  Debtor's Husband's Bankruptcy

Soon after Debtor bought the Bethlehem home, both DelCorsos considered

bankruptcy as a way to deal with their financial difficulties.  After an abominable

experience with a Georgia credit repair company,[9] the DelCorsos decided to retain a

lawyer and file for bankruptcy.  They found Mr. Lightner's name in the telephone book

and went to speak with him in 2005, intending to file for bankruptcy relief jointly.  But

Mr. Lightner advised them that Mr. DelCorso should file alone,[10] which he did in October

---

[9]The DelCorsos paid New Leaf Associates (a so-called credit repair company) $5,000 to
reduce or eliminate their credit card debt.  After paying the $5,000 and receiving no benefits or
services from New Leaf, the DelCorsos discovered that New Leaf was a scam that shortly went
out of business.  Because the DelCorsos had received in excess of $100,000 of equity from the
sale of the Stroudsburg home, they should have been good candidates for working out
arrangements with their creditors for partial or total repayment without the need to file for
bankruptcy.  Unfortunately, they did not retain the proper professionals to assist them.

[10]No witness testified about the rationale for that advice from Mr. Lightner.  The reason
could have been as simple as the possibility that only Mr. DelCorso's creditors were pressing
him.  Or the reason could have been that, notwithstanding the more than $100,000 equity in the
Bethlehem home, Mr. Lightner saw the individual filings as a way to attempt to eliminate all of
the DelCorsos' debt.

2005.

     In preparing the papers for Mr. DelCorso's bankruptcy, which was filed in

this Court at Docket No. 05-26671,[11] Mr. Lightner left both Schedule A (real property)

and Schedule D (creditors holding secured claims) blank, indicating no ownership interest

whatsoever by Mr. DelCorso in any real property and no mortgage debt. Mr. DelCorso's

Schedule F (creditors holding unsecured nonpriority claims) listed $55,749.70 of debt

owed to eight creditors, primarily for credit cards. One of Mr. DelCorso's unsecured

creditors, Chase, was listed as a joint debt of $5,106.88 owed to Chase by both Mr.

DelCorso and Debtor in a credit account number ending 8744. On December 21, 2005,

the Chapter 7 Trustee in Mr. DelCorso's bankruptcy reported the case as a "no-asset" case

with no distribution to any of Mr. DelCorso's creditors.[12] Mr. DelCorso received his

discharge on March 21, 2006, and his Chapter 7 case was closed shortly thereafter.

---

    [11]A bankruptcy court may take judicial notice, under Fed. R. Evid. 201 (incorporated into
bankruptcy cases by Fed. R. Bankr. P. 9017), of the docket entries and the bankruptcy petition,
schedules, and statement of financial affairs filed in a case, see Maritime Elec. Co., Inc. v. United
Jersey Bank, 959 F.2d 1194, 1200 n. 3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2
(N.D. Ill. 1993); In re Paolini, 1991 WL 284107, at *12 n. 19 (Bankr. E.D. Pa. 1991); see
generally In re Indian Palms Assoc., Ltd., 61 F.3d 197 (3d Cir. 1995). Although most instances
in which a court will take judicial notice of a docket relate to the docket in the case then before
the court, the verity of the docket does not diminish merely because it is for another case.

    Beyond my taking judicial notice of Mr. DelCorso's case docket, however, the United
States Trustee presented and offered into the October 18, 2007 hearing, copies of the docket for
Mr. DelCorso's bankruptcy case and his schedules of assets and liabilities, all of which were
marked together as Exhibit T-5. Exhibit T-5 was admitted without objection as evidence in the
October 18, 2007 hearing.

    [12]If Mr. Lightner had scheduled the Bethlehem home as owned by both Mr. DelCorso and
his wife, at least one creditor, Chase, should have received full payment of its claim.

**D. Debtor's Transfer of the Bethlehem Home and Her Bankruptcy**

Debtor received a collection letter from a creditor in mid-2006 and went to

Mr. Lightner to discuss filing for bankruptcy. Mr. Lightner asked her questions about the

title and ownership of the Bethlehem home[13] and advised her to execute and record a deed

for the Bethlehem home from Debtor alone to Debtor and her husband together as tenants

by the entirety.[14] Debtor agreed and she paid $200 ($155[15] of which was the fee) to Mr.

Lightner for him to prepare and record such a deed. The deed from Debtor alone to

Debtor and her husband as tenants by the entirety was filed and recorded in the

Northampton County Recorder of Deeds Office on September 20, 2006 (the "2006

Deed"). Slightly over a week later, on September 29, 2006, Mr. Lightner filed Debtor's

---

[13]Debtor informed Mr. Lightner about the circumstances surrounding her acquisition of
title in the Bethlehem home in her name alone. This included the requirement of Countrywide,
the mortgage lender, that the title of the property and the mortgage loan be in Debtor's name
alone.

[14]Under Pennsylvania common law, a husband and wife together as tenants by the entirety
is considered, as a legal fiction, to be a separate legal entity from either of the spouses
individually. See In re Gregorchik, 311 B.R. 52, 54 (Bankr. W.D. Pa. 2004). Owning property
as tenants by the entirety, therefore, has legal properties very distinct from individual ownership
of property. See discussion below at pp. 15 - 19.

[15]Mr. Lightner testified incorrectly in the October 18, 2007 hearing that $50 of the $200
fee was for filing and recording fees. The 2006 Deed for the Bethlehem home is Exhibit T-3,
which was offered by the United States Trustee and was admitted as evidence without objection
in the October 18, 2007 hearing. The certified copy of the deed offered into evidence is stamped
with a list of the various fees charged by the Northampton County Recorder of Deeds, which
recording fees total $45. Therefore, $155 of the $200 was Mr. Lightner's counsel fee.

initial petition in this Chapter 7 case, charging her a fee of $1,000.[16] Mr. Lightner filed

Debtor's original schedules and statement of financial affairs on October 16, 2006.

Debtor's Schedule A (real property), on the advice and counsel of Mr. Lightner, identified

the Bethlehem home as being owned by the DelCorsos jointly. Debtor's Schedule D

(creditors holding secured claims), however, was silent on whether the mortgage loan

secured by the Bethlehem home was Debtor's or her husband's or their joint debt. Mr.

Lightner also prepared Schedule C (property declared as exempt), in which Debtor

elected her Pennsylvania state exemptions, which would have resulted in the exemption

of approximately $114,000 of equity in the Bethlehem home.

In paragraph 10 of Debtor's statement of financial affairs, Debtor

responded, upon the advice and counsel of Mr. Lightner, "None" to the question whether

she had transferred any property within the two years immediately preceding the

commencement of this case. Debtor had not advised Mr. Lightner to mark the answer to

Paragraph 10 "None." When she reviewed the statement before signing it, however,

Paragraph 10 was so marked.[17]

On November 15, 2006, at the request of the Chapter 7 Trustee, Mr.

---

[16]Debtor's initial petition, schedules, and statement of financial affairs are marked
together as Exhibit T-1 and were admitted as evidence without objection in the October 18, 2007
hearing. See also footnote 11, above, relating to judicial notice of court documents.

[17]Mr. Lightner claims that Paragraph 10 was answered "None" rather than disclosing the
2006 Deed because he did not want an affirmative answer to constitute an admission that a
transfer had taken place. But the ease with which a "notice only" disclosure could have been
made belies that purported intention.

Lightner filed Debtor's Amended Schedule F (creditors holding unsecured nonpriority

claims).   The claims in her original Schedule F had not been designated as either hers,

her husband's, or jointly owed.   The only revision in the Amended Schedule F was to

designate all of her unsecured debt as her sole obligation.   This includes the claim of

Chase, account number ending 8744, in the amount of $5,264.86, which Mr. DelCorso

had listed in his Schedule F as joint debt.[18]   The Chase claim had been jointly owed at the

time of Mr. DelCorso's prior bankruptcy, but upon his discharge in bankruptcy, the Chase

claim was thereafter designated as Debtor's alone.

At the creditors' meeting, the Chapter 7 Trustee asked Debtor if she had

transferred any property in the two years before the filing of her petition and Debtor told

the Chapter 7 Trustee about the 2006 Deed.   Until the Chapter 7 Trustee posed that direct

question to Debtor, neither Debtor nor her counsel, Michele DeWald, Esquire (an

associate attorney in Mr. Lightner's office who had attended the creditors' meeting on

Debtor's behalf)("Ms. DeWald"), had volunteered to the Trustee any information about

the 2006 Deed.[19]   Ms. DeWald did not say anything to Debtor about the effect of the

---

[18]See text at pp. 7 - 8, above.

[19]Mr. Lightner declared at the October 18, 2007 hearing that either Debtor or Ms. DeWald
would have volunteered disclosure about the 2006 Deed to the Chapter 7 Trustee if she had not
asked Debtor about it.  In his brief, Mr. Lightner says he knew the Trustee would ask that
question.  But (i) Mr. Lightner did not have Ms. DeWald at the hearing to testify, (ii) Mr.
Lightner did not testify that he had told either person to make the disclosure, and (iii) Mr.
Lightner failed to question Debtor whether she or Ms. DeWald intended to make such a
disclosure.  Therefore, I have no evidence to support his statement that the 2006 Deed would
have been disclosed.  I conclude and find that the information would not have been given to the

Trustee's questions about the 2006 Deed or any possible repercussions that might arise

from Debtor's oral disclosure.  Neither had Mr. Lightner previously advised Debtor at any

time about issues that might arise from the pre-petition 2006 Deed transferring the

Bethlehem home.

Following the creditors' meeting, the Chapter 7 Trustee filed objections to

Debtor's exemptions on December 4, 2006.  On December 15, 2006, the Trustee also

filed her adversary proceeding seeking to avoid the transfer of the Bethlehem home to

Debtor and her husband as a fraudulent transfer.[20]  Debtor attempted (through her

husband) to contact Mr. Lightner for two weeks after receiving the various papers from

the Chapter 7 Trustee.  When Mr. DelCorso was finally able to speak with Mr. Lightner,

Mr. Lightner did not tell Mr. DelCorso that Debtor could oppose the Trustee's actions.

Mr. Lightner told Mr. DelCorso that Debtor could do nothing in response to the Trustee's

actions other than pay all of her creditors in full.  Mr. DelCorso asked Mr. Lightner if

Debtor could withdraw her case or convert to Chapter 13; Mr. Lightner informed him that

she could do neither.  Mr. DelCorso then informed Mr. Lightner that Debtor had obtained

---

Trustee if she had not asked the specific question about transferred property as she did.

[20]Mr. Lightner also claims in his brief that the Chapter 7 Trustee was not concerned with
the actual transfer of the Bethlehem home by the 2006 Deed, but was primarily concerned with
the disposition of the equity from the sale of the Stroudsburg home.  I cannot accept that
interpretation of the Trustee's intention as having any basis whatsoever in the language and text
of the Trustee's pleadings.  The Trustee believed that Debtor had fraudulently transferred the
Bethlehem home from herself to the DelCorsos together to take it out of the estate and filed her
papers to rectify that transfer.

(before the bankruptcy filing) agreements from some of her creditors that would allow

Debtor to pay one-half of the debt and be forgiven for the balance.  Mr. Lightner prepared

settlement documents for each creditor to release Debtor upon payment in full of its

claims against her.  But the Chapter 7 Trustee, upon learning about the 2006 Deed,

required that all of Debtor's creditors be paid in full.  Eventually, the DelCorsos borrowed

funds from Mr. DelCorso's sister to pay the creditors.

Debtor then retained her current counsel, P. Gregory Dolan, II, Esquire

("Mr. Dolan"), to replace Mr. Lightner and represent her.  Mr. Dolan filed responses to

the Trustee's exemption and avoidance litigation[21] and ultimately entered into a

settlement with the Trustee.  Debtor was required to pay certain of her creditors in full

and she did not obtain a discharge in her Chapter 7 bankruptcy.[22]  Debtor settled rather

than fight the Trustee because, if she fought the Trustee, she might win or she might lose.

Whether she won or lost, however, she would incur additional substantial costs and

attorneys' fees.  Despite the settlement, Debtor owed and paid at least $1,250 in

attorneys' fees to Mr. Dolan.[23]

_____

[21]Mr. Lightner points to Mr. Dolan's pleadings opposing the Trustee's actions against
Debtor as proving that some defense had a chance of success.  I do not see it that way at all.  Mr.
Dolan, replacing Mr. Lightner in the midst of looming filing deadlines against Debtor, filed
opposing pleadings.  But the record also reflects his immediate virtually unconditional surrender
to the Trustee in the litigation.

[22]Debtor therefore repaid more of her debt than she would have had to pay if she had not
filed her bankruptcy.

[23]The only amount of Mr. Dolan's attorney's fees for which any evidence was given is the
$1,250 figure.  The docket for this case includes no disclosure or other information relating to

## IV. DISCUSSION

Two issues control my decision in this matter.  First, was the transfer of the Bethlehem home from Debtor alone to Debtor and her husband as tenants by the entirety on the eve of Debtor's bankruptcy lawful or unlawful?  Otherwise expressed, did the transfer of the Bethlehem home, through the 2006 Deed, constitute a fraudulent transfer? As I explain below, I conclude that the preparation and recording of the 2006 Deed for the Bethlehem home from Debtor alone to Debtor and her husband as tenants by the entirety was unlawful and constituted a fraudulent transfer.

Second, upon concluding that the transfer of the Bethlehem home by the 2006 Deed was unlawful and a fraudulent transfer, should Mr. Lightner disgorge his fees and pay sanctions to Debtor because he advised Debtor to do the unlawful act and did not disclose it to the Chapter 7 Trustee?  Mr. Lightner argues that his belief about the relevant law in September 2006 is the basis for what he counseled Debtor to do at that time. He claims that, if he believed that what he advised Debtor to do was entirely proper, above board, and appropriate, he should not be sanctioned.  Mr. Lightner argues that he should not be sanctioned for counseling his client to maximize the protection of her assets in her pending bankruptcy, when the advice he gave her was based upon his reasonable belief about the state of the relevant law.  Again, as I explain below, I conclude that Mr.

---

Mr. Dolan's fees.

Lightner's advice to Debtor about the 2006 Deed subjects him to disgorgement of his fees
and a further sanction.


## A.  Transfer of Title to the Bethlehem Home from Debtor Alone to Debtor and Her Husband as Tenants by the Entirety

The recording of the 2006 Deed from Debtor alone to Debtor and her
husband as tenants by the entirety[24] on the eve of Debtor's bankruptcy was unlawful.  I
start with a discussion of the nature of tenancies by the entirety under applicable
Pennsylvania law.[25]

### 1.  Pennsylvania Tenancies by the Entirety[26]

Tenancy by the entirety is a unique form of ownership under Pennsylvania
law that exists when property, either real or personal, is placed in the names of both
husband and wife.  Clingerman v. Sadowski, 519 A.2d 378, 380-81 (Pa. 1986).  Tenancy
by the entirety is a different legal entity than either or both of the spouses.  Each spouse

---

[24]Courts refer to tenants "by the entireties" almost as often as they refer to tenants "by the entirety."  Black's Law Dictionary (8th ed. 2004), however, uses the singular "by the entirety."

[25]"Since property law in general and the law of co-tenancies in particular are creatures of state law, the 'applicable nonbankruptcy law' is the applicable Pennsylvania law of tenancy by the entirety."  Napotnik v. Equibank and Parkvale Savings Ass'n, 679 F.2d 316, 318 (3d Cir. 1982).

[26]The brief submitted in this case by Dave P. Adams, Esquire, counsel for the United States Trustee, is replete with relevant analysis and supporting citations relating to, inter alia, Pennsylvania law regarding tenancies by the entirety.  Portions of this Memorandum Opinion, therefore, draw heavily on Mr. Adams' brief.  Mr. Lightner's research and brief refer me to no cases that are not included in Mr. Adams' brief.

15

has an undivided interest in the possession and enjoyment of the whole of the property

and all of the rights arising from possession during their respective lifetimes. Id. at 381.

Neither spouse can unilaterally sever the tenancy or encumber the interest of the other

spouse. Id. See also Beihl v. Martin, 84 A. 953, 954-55 (Pa. 1912)(a tenancy by the

entirety can only be terminated by agreement of both spouses,[27] divorce, or the death of

either spouse).

Because neither spouse has a separate, independent interest in the property,

a creditor of one spouse cannot execute on entirety property while the other spouse is

living. Lunnen v. Hunter, 35 A.2d 292, 294 (Pa. 1944).  At most, a creditor of one spouse

holds a contingent expectancy, a potential claim or lien, that might be realized only if that

debtor spouse survives.  Any such claim or lien is lost, however, if the debtor spouse dies

first or if the married couple transfers the property.  Beihl, 84 A. at 955-56.  A creditor

may, of course, create a judgment lien and execute on entirety property to satisfy joint

debts of both the husband and the wife.  Napotnik v. Equibank and Parkvale Savings

Ass'n, 679 F.2d 316, 320 (3d Cir. 1982).

As stated in United States v. Klimek, 952 F. Supp. 1100, 1115 (E.D. Pa.

1997): "The law in Pennsylvania is quite clear that for a tenancy by the entirety to arise,

the 'four unities' of time, title, interest, and possession, and marriage must exist

---

[27]See footnote 7, above, in which I find that Mr. DelCorso voluntarily dedicated, with
Debtor, the proceeds from the sale of the Stroudsburg home to Debtor's purchase of the
Bethlehem home in her name alone. This is the sort of voluntary termination of a tenancy by the
entirety interest in property that the court in Clingerman acknowledges.

simultaneously." In <u>Madden v. Gosztonyi Savings & Trust Co.</u>, the Pennsylvania

Supreme Court stated:

> Joint tenancies have four unities:  Interest, title, time and possession. . . .
> Tenancies by the entireties . . . resemble joint tenancies.  All four of the
> unities are present.  But as Blackstone says (page 182): " * * * if an estate
> in fee be given to a man and his wife, they are neither properly joint tenants,
> nor tenants in common; for husband and wife, being considered as one
> person in law, they cannot take the estate by moieties, but both are seised of
> the entirety, *per tout et non per my*: the consequence of which is, that
> neither the husband nor the wife can dispose of any part without the assent
> of the other, but the whole must remain to the survivor."  To the four unities
> of a joint tenancy therefore is added the unity of the husband and wife as a
> person in the law.

200 A. 624, 627 (Pa. 1938).  <u>See also</u> <u>Walsh v. Gregorchik</u> (<u>In re Gregorchik</u>), 311 B.R.

52, 54 (Bankr. W.D. Pa. 2004)(a tenancy by the entirety is a joint tenancy that is modified

by the legal fiction that a husband and wife are a single person).  A tenancy by the entirety

arises when a husband and a wife take identical interests simultaneously by the same

instrument, with the same right of possession.  Each spouse owns the whole or the entire

property and not merely a divisible part of the whole.  <u>Farda v. Commonwealth of

Pennsylvania</u>, 849 A.2d 297, 298 n. 1 (Pa. Cmwlth. 2004).

The four unities did not exist in the Bethlehem home until Debtor executed

and recorded the 2006 Deed to herself and her husband.

First, unity of title exists when the married couple obtain title by and

through the same instrument.  <u>Fenderson v. Fenderson</u>, 685 A.2d 600, 607 (Pa. Super. Ct.

17

1996), appeal denied, 698 A.2d 594 (Pa. 1997). The instrument by which the Bethlehem

home was originally acquired must have been in the names of both husband and wife to

satisfy this unity. It was not. See also Klimek, 952 F. Supp. at 1115. No interest of Mr.

DelCorso is set forth in any instrument (until the 2006 Deed) and no unity of title existed

because the Bethlehem home was titled solely in the name of Debtor.

Second, Fenderson also instructs that unity of time requires that the interest

of each spouse vests at the same time. Mr. DelCorso's ownership interest in the property

did not exist until the 2006 Deed to both the DelCorsos.

Third, the court in Fenderson noted that the unity of interest requires the

tenants to have estates in the property of the same type, duration, and amount. Whatever

interest, if any, Mr. DelCorso might have had when Debtor held title alone, it was

certainly not of the same type, duration, or amount as the interest that Debtor held.

Although the unities of title, time, and interest did not exist until September

2006, the unity of possession appears to have existed from the date the Bethlehem home

was purchased by Debtor. But that unity of possession, standing alone as it does, is

insufficient for me to determine that the Bethlehem home is owned by the DelCorsos as

tenants by the entirety. No tenancy by the entirety existed in the Bethlehem home

because no unity of title, no unity of interest, and no unity of time existed. Because three

of the unities were missing, no tenancy by the entirety existed until the 2006 Deed to

18

Debtor and her husband. Madden, 200 A. at 631.[28]

Property can be presumed to be held by a husband and wife as tenants by

the entirety, but only if the property is conveyed to or held by both spouses. Title is then

presumed to be held by the entirety even if the conveyancing instrument is silent in that

regard. In re Holmes' Estate, 200 A.2d 745, 747 (Pa. 1964). When property is titled in

only one spouse, no such presumption arises and such property cannot be presumed to be

held by a married couple as tenants by the entirety. In re Grubbs, 113 B.R. 201, 202

(Bankr. W.D. Pa. 1990); B.K. Medical Systems, Inc. v. Roberts (In re Roberts), 81 B.R.

354, 364 (Bankr. W.D. Pa. 1987).

The transfer of property therefore from one spouse to the married couple as

tenants by the entirety constitutes a transfer of the property from one legal entity to a

different legal entity. Such a transfer removes the property from the reach of creditors of

the individual owner.[29] Such a transfer is avoidable pursuant to provisions of

Pennsylvania state law[30] and of the Bankruptcy Code[31] both of which authorize and

---

[28]Even if only one of the "unities" were missing, no tenancy by the entirety would have
existed.

[29]Lunnen, 35 A.2d at 294. This is precisely the effect that Mr. Lightner sought through
the 2006 Deed.

[30]12 Pa. C.S.A. §§5101 - 5110 (a portion of the Pennsylvania Uniform Fraudulent
Transfer Act)(applicable to bankruptcy cases through the trustee's avoidance powers under
Section 544 of the Bankruptcy Code, 11 U.S.C. §544).

[31]11 U.S.C. §548 (Bankruptcy Code fraudulent transfer section).

provide for the avoidance of fraudulent transfers.

## 2. The DelCorsos' Indicia of Ownership of the Bethlehem Home as Tenants by the Entirety

If ownership by one spouse can, in all or in certain circumstances, be considered to be legally equivalent to ownership by both that person and his or her spouse as tenants by the entirety, then the change of title from the individual to the couple would effect no transfer. This is Mr. Lightner's fundamental argument. He asserts that certain elements or indicia of title existed that allow or require that the Bethlehem home have been deemed to be owned by the DelCorsos as tenants by the entirety at some time after Debtor acquired title to the Bethlehem home. Mr. Lightner points to three factual supports for this approach. Each of the three factual components of his argument were proven in the October 18, 2007 hearing by competent, credible evidence that was unchallenged. First, the couple regarded the Bethlehem home as their property together. Second, Mr. DelCorso contributes to the family a portion of his income to pay the mortgage and assists with the upkeep, maintenance, day-to-day and periodic expenses, and all other burdens concomitant with home ownership. Third, the down payment of more than $100,000 toward the purchase of the Bethlehem home came from the sale of the Stroudsburg home, which was owned by the DelCorsos as tenants by the entirety.

Mr. Lightner argues that the proceeds from the sale of the Stroudsburg home were owned as tenants by the entirety and the nature of that ownership carried over

20

to the Bethlehem home.  The down payment, he claims, being property owned as tenants

by the entirety, transformed the clear, express title[32] in the Bethlehem home for which it

was the down payment to ownership by the DelCorsos as tenants by the entirety.

Mr. Lightner points to the decision of the Pennsylvania Supreme Court in

Hengst v. Hengst, 420 A.2d 370 (Pa. 1980), as supporting this argument.  The Court in

Hengst ruled that property (a company savings account) titled in husband's name alone,

but treated during the marriage by both spouses as property owned by both of them, was

an inter vivos gift from the husband to himself and his wife that constituted jointly held

property.  The husband testified that he had intended the account to be both his and his

wife's property and both spouses testified that they had regarded the account as their joint

property, even though it was in the husband's name alone.  The Court went on to note that

the husband's ability to dedicate a portion of his income to funding the account resulted

from the wife's employment and payment of the household expenses, thereby freeing his

income for deposit into the account.

For four different and compelling reasons, however, Hengst cannot be

regarded as support for Mr. Lightner's position.  First, the Pennsylvania Supreme Court

recognized the unique factual situation with which it was confronted when it concluded

---

[32]Not only was title in the Bethlehem home in Debtor's sole name clear and express in the
deed to her, it was mandated as Countrywide's condition to lend the mortgage funds to acquire
the Bethlehem home.

its opinion by noting that its decision was made "under the special circumstances of this

case . . . ."    Hengst, 420 A.2d at 371.  Although the Court did not expressly warn that its

holding was limited to the facts of the case, its remark that its decision was made under

special circumstances naturally limits the scope of its effect and its applicability as

precedent for deciding cases with dissimilar facts.  Moreover, the Court's analysis was

primarily focused on what was required for a court to recognize the husband's implied

inter vivos gift of the account and not on the effect of the decision on the concept of

tenancy by the entirety.

Second, the Court made its Hengst ruling in express reliance on the

circumstance that "no third party is even remotely affected . . . [by the ownership of the

account]." Hengst, 420 A.2d at 371.  The dispute in Hengst was solely between the

divorcing spouses and no repercussions affected third parties.  But in the case before me,

all of Debtor's creditors were third parties who had a vital stake in the nature of the title

of the Bethlehem home.  The ability of Debtor's creditors to receive any distribution

depended entirely on whether the Bethlehem home was owned by Debtor alone or by

Debtor and her husband as tenants by the entirety.  This critical distinction renders the

Hengst decision wholly inapplicable to my determination of the title of the Bethlehem

home under applicable Pennsylvania law.  See Gilliland v. Gilliland, 751 A.2d 1169,

1172-73 (Pa. Super. Ct. 2000)(because third parties are affected by the status of the title

of property, i.e., third parties have a definite interest in the state of the title, Hengst is

22

inapplicable).

Third, Mr. Lightner's interpretation of <u>Hengst</u>, if followed to his natural extension, could not be limited to issues relating to the title of married couples' property. Unmarried parties, arguing as Mr. Lightner does, could adopt the underlying precepts of <u>Hengst</u>: (i) intention of the parties, (ii) their mutual sharing of the costs and maintenance of property, and (iii) their together providing a down payment (or partial funding) for acquisition of the property.  In such cases, acceptance of Mr. Lightner's extension of <u>Hengst</u> would result in mayhem in determining, at any given time,[33] the state of the title of any property.  This would be of particular concern when, as here, the property is subject to Pennsylvania's general recording statute.[34]  No title searcher could ever know that property was or was not owned by the parties identified on a deed.  Mr. Lightner's argument would wreak havoc with all real estate transactions and financing.

Finally, fourth, when was Mr. Lightner's unwritten tenancy by the entirety created, <u>i.e.</u>, when did that form of ownership exist for the Bethlehem home? Immediately at the settlement table?  Does Mr. Lightner's theory result in Countrywide's mortgage, which is recorded in Debtor's name alone, failing to attach to the property?  If

---

[33]If the parties' intention with respect to the property and their joint contribution can create the joint title, their intention and cessation of joint contribution could terminate it. Extending this possibility, reductio ad absurdum, the status of the title could be on again, off again, on again over time.

[34]21 P.S. §351.

the property, immediately upon closing, was owned by the DelCorsos as tenants by the

entirety, Countrywide's mortgage against Debtor alone, filed after the closing, could not

have been a lien on the Bethlehem home.  On the other hand, if the entirety status arose

some time after the Countrywide mortgage was filed, on what grounds and when did it

arise?  What occurred from the closing table to some later point in time?  What

declaration of Debtor sparked the transfer?  Presumably, the event or declaration occurred

some time after Mr. DelCorso's bankruptcy, because he owned no interest in the

Bethlehem home at the time of his bankruptcy.  So when, after Mr. DelCorso's

bankruptcy and before the 2006 Deed, did some event or declaration transform the

ownership of the Bethlehem home to a tenancy by the entirety?   All of these logical

extensions of and questions arising from Mr. Lightner's argument lead to absurd results

that speak volumes for rejecting his attempt to apply <u>Hengst</u> to this case.

In light of my finding that the <u>Hengst</u> decision is wholly inapplicable to this

case, Mr. Lightner has not shown me (nor has my own research found) any other

Pennsylvania or federal decision that remotely supports his title theory.[35]  Without the

four unities, the parties' expectations and intent, the contributions by both spouses toward

---

[35]Mr. Lightner argues that the United States Trustee's effort to distinguish <u>Hengst</u> proves
that <u>Hengst</u> provides some reasonable basis for him to have given Debtor the advice and counsel
that are at issue here.  I disagree.  The only law that Mr. Lightner presses in his brief is a
misguided extension of the <u>Hengst</u> decision.  It may have taken five pages or so of this
Memorandum Opinion to show it, but <u>Hengst</u> just plain does not support the creation of title in
the DelCorsos as tenants by the entirety prior to the 2006 Deed in this case.

maintenance and the mortgage, and the source of the down payment as proceeds from the

Stroudsburg home did not affect title to the Bethlehem home.   The DelCorsos did not

own the Bethlehem home as tenants by the entirety until the 2006 Deed was executed and

recorded.

**3.  Pennsylvania Marriage Law - Title 23, Pennsylvania Consolidated Statutes**

Mr. Lightner referred to Pennsylvania state domestic relations law in his

Answer to the Disgorgement Motion as controlling (or at least strongly supporting) his

argument that the Bethlehem home was owned by the DelCorsos as tenants by the entirety

before the 2006 Deed.  Although his brief did not provide any further arguments about the

applicable Pennsylvania domestic relations law, he has not abandoned it.  I will therefore

analyze his argument relating to marital property as the equivalent of property owned as

tenants by the entirety.  Mr. Lightner had referred to Section 3501(b) of the Pennsylvania

Domestic Relations Code, 23 Pa. C.S.A. §3501(b), which provides that all property

acquired by either spouse during the marriage is presumed to be marital property.  Section

3501 (Definitions) states, in pertinent part:

> (a) **General rule.**  –  As used in this chapter, "marital property" means all
> property acquired by either party during the marriage . . ..

> (b) **Presumption.** – All real or personal property acquired by either party
> during the marriage is presumed to be marital property regardless of whether title
> is held individually or by the parties in some form of co-ownership such as joint
> tenancy, tenancy in common, or tenancy by the entirety. . . .

23 Pa. C.S.A. §3501.

Wholly antithetical to Mr. Lightner's argument is the introductory phrase of

Section 3501(a), which states: "As used in this chapter . . .." Chapter 35 of Title 23 is the

Property Rights Chapter of the Pennsylvania Marriage Law, and pertains only to issues

arising out of domestic relations difficulties in a marriage. I am pleased (for the

DelCorsos' sake) to note that, despite the financial burdens they have faced, they

presented neither evidence nor indication of marital problems, whether presently or at any

other relevant time. Title 23 does not apply to the DelCorsos and, therefore, Chapter 35

and Section 3501 do not apply to ownership of the DelCorsos' Bethlehem home. Support

for this decision is found in Farris v. Jefferson Bank (In re Farris), in which our now

Chief Judge Sigmund declared:

> [T]he concept of marital property arises only in the context of divorce, when the
> spouses' marital property is being equally divided. See United States v. Premises
> Known as 717 South Woodward Street, Allentown, Pennsylvania, 2 F.3d 529 (3d
> Cir. 1993)(concluding that the Supreme Court of Pennsylvania would not read the
> marital property provision contained in 23 Pa. C.S.A.§3501 as conferring upon
> [one spouse] any ownership interest in property, outside the context [sic] equitable
> distribution, where [the other spouse] was listed as the sole record owner of such
> property).

194 B.R. 931, 941-942 n. 12 (Bankr. E.D. Pa. 1996).

Judge Sigmund also examined the distinction, made quite clear in

Pennsylvania appellate decisions, between marital property and property held in a tenancy

by the entirety. She refers to both <u>Livingston v. Unis</u>, 659 A.2d 606, 611 (Pa.

Cmwlth.)(although lottery proceeds won during a marriage constitute marital property,

the winnings are not necessarily entirety property that is vulnerable to the other spouse's

creditors), and <u>Fratangelo v. Fratangelo</u>, 520 A.2d 1195, 1201 (Pa. Super. Ct.1987)(the

presumption that all property acquired during a marriage is marital property is not

equivalent to the creation of entirety property). <u>See</u> <u>Farris</u>, 194 B.R. at 942, n.12.

The application of the law relating to marital property is foreign to this case

because the DelCorsos are not and have not been in the throes of any domestic relations,

separation, or divorce difficulties. The Bethlehem home is not subject to equitable

distribution and no presumption of ownership as tenants by the entirety arises by either

inference, dictate, or presumption of Pennsylvania's Marriage Law in Title 23.

## 4. Requirements of Title Agents

Finally, Mr. Lightner argued in his Answer to the Disgorgement Motion

that his experience has shown him that title agents routinely require, upon the sale of

property by a spouse, that the other spouse also sign off on the sale.[36] The signature of

---

[36]My experience for years before taking the bench, however, was to the contrary. Most title companies did not require the non-owning spouse to sign off on a sale unless the selling spouse acknowledges in the seller's affidavit that some domestic relations issue (separation, divorce, equitable distribution, etc.) is pending. My contrary prior experience is not evidence in this case, so I will disregard it. Mr. Lightner offered no particular expertise in consumer real estate transactions, so I will also disregard his comments about the customs of the title industry.

the other spouse, he claims, might not be required on a deed, but the other spouse is

typically required to sign some writing consenting to the sale. In all real estate

transactions, the seller is obliged to execute a seller's affidavit that typically includes

statements about the seller's marital status, including any marital issues that might be

pending. Mr. Lightner has offered no case law explaining this title requirement, but it is

clear to me that the Pennsylvania Marriage Law is the cause of such caution. The

potential effects of having property of the selling spouse designated marital property

according to the Marriage Law and therefore subject to a potential claw-back has led title

agents to require both spouses to sign off on the transaction. If the seller's affidavit

shows a domestic relations issue exists, execution of some consent form by the non-

selling spouse might be required. Neither Mr. Lightner nor the United States Trustee

refers me to any decisions that have addressed this issue one way or the other. I believe

that the potential that property might later be designated marital property does not affect

the status of the title as being in only one spouse unless and until domestic relations issues

arise.

## B. The 2006 Deed as a Fraudulent Transfer

I face an apparently express and open effort to hinder, delay, or defraud the

Chapter 7 Trustee to prevent any distribution of Debtor's funds to Debtor's creditors.

Debtor's removal of the Bethlehem home from her sole ownership by the 2006 Deed was an attempt to remove it from consideration as an asset subject to distribution to creditors. I do not see how this constitutes anything other than a classic, fraudulent transfer with actual intent under both the Bankruptcy Code and the Pennsylvania Fraudulent Transfer Statute.

Mr. Lightner suggests that he told Debtor to change the title to avoid difficulties in describing to the Chapter 7 Trustee and the creditors that the true title to the Bethlehem home had actually been in the DelCorsos as tenants by the entirety. The 2006 Deed, he maintains, merely confirmed on the record the true state of the title. Rather than presenting, in the statement of financial affairs, this rational explanation for what Debtor was purportedly doing, Mr. Lightner intentionally avoided disclosing the 2006 Deed in the written schedules and statement. Again, the parties (Mr. Lightner in particular) have referred me to no cases on all fours with this issue and I have found none, perhaps because no one has previously thought it appropriate or prudent to pursue such an argument.

Mr. Lightner has effectively conceded that, if the title of the Bethlehem home was not in the DelCorsos as tenants by the entirety before the 2006 Deed, the 2006 Deed constitutes a fraudulent transfer. The 2006 Deed was a fraudulent transfer that was actually intended to hinder, delay, or defraud creditors under Section 548(a)(1)(A) of the

29

Bankruptcy Code:

> (a)(1)  The Trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily —

>> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . ..

11 U.S.C. §548(a)(1)(A), or under Section 5104(a)(1) and (b) of the Pennsylvania

Uniform Fraudulent Transfer Act:

> (a) General rule. – A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

>> 1.  with actual intent to hinder, delay or defraud any creditor of the debtor . . ..

> (b) Certain factors.  In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

>> 1.  the transfer or obligation was to an insider;
>> 2.  the debtor retained possession or control of the property transferred after the transfer;
>> 3.  the transfer or obligation was disclosed or concealed;
>> 4.  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>> 5.  the transfer was of substantially all the debtor's assets;
>> 6.  the debtor absconded;
>> 7.  the debtor removed or concealed assets;
>> 8.  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

30

9. the debtor was insolvent or became insolvent shortly after
the transfer was made or the obligation was incurred;
10. the transfer occurred shortly before or shortly after a
substantial debt was incurred; and
11. the debtor transferred the essential assets of the business
to a lienor who transferred the assets to an insider of the
debtor.

12 Pa. C.S.A. §5104(a)(1) & (b). I believe that the fraudulent transfer was done with

actual intent under Section 548(a)(1) of the Bankruptcy Code because Mr. Lightner

wanted the state of the title to be as tenants by the entirety to protect the equity in the

Bethlehem home from Debtor's creditors. The same intent satisfies Section 5104(a)(1) of

the Pennsylvania Uniform Fraudulent Transfer Act for the same reason and because nine

of the "badges of fraud"[37] enumerated in sub-section 5104(b) apply to the 2006 Deed.[38]

Alternatively, I believe that the 2006 Deed was a constructive fraudulent

transfer under Section 548(a)(1)(B) of the Bankruptcy Code:

(a)(1) The trustee may avoid any transfer . . . of an interest of the
debtor in property, or any obligation . . . incurred by the debtor that was
made or incurred on or within 2 years before the date of the filing of the

---

[37](1.) The 2006 Deed was to an insider; (2. ) possession or control of the Bethlehem
home did not change after the 2006 Deed; (3.) the 2006 Deed was concealed; (4.) before the 2006
Deed, Debtor had collection efforts made against her and contemplated bankruptcy; (5.) the
2006 Deed eliminated all of Debtor's equity in the Bethlehem home; (7.) Debtor concealed the
change in title of the Bethlehem home; (8.) Debtor received no consideration for the transfer of
the Bethlehem home; (9.) Debtor became insolvent after the 2006 Deed; and (10.) the 2006
Deed was recorded shortly before Debtor's bankruptcy. See 12 Pa. C.S.A. §5104(b).

[38]See also Eisenberg v. Rickard (In re Rickard), No. 05-2778, 2006 WL 3859239 (Bankr.
E.D. Pa. Nov. 13, 2006)(deed to relative shortly before bankruptcy avoided as a fraudulent
transfer).

31

petition, if the debtor voluntarily or involuntarily —

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;.

or under Section 5105 of the Pennsylvania Uniform Fraudulent Transfer Act:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 Pa. C.S.A. §5105.  Once again, I believe that the 2006 Deed was a constructive fraudulent transfer under both the Bankruptcy Code and the Pennsylvania Uniform Fraudulent Transfer Act because Debtor received nothing for it, it was to an insider, and because it rendered her insolvent by eliminating all of the equity that had been in Debtor's name alone.

I conclude that Debtor's execution and recording of the 2006 Deed for the Bethlehem home from herself to herself and her husband as tenants by the entirety, done entirely upon the advice and counsel of Mr. Lightner constituted a fraudulent transfer that would certainly have been avoided if the parties had not settled the Chapter 7 Trustee's adversary proceeding as they had.  Moreover, I believe that the avoidance litigation need

32

not have been based on the more easily proven constructive demonstration of intent to

hinder, delay, or defraud creditors,[39] but would have been successful by showing an

outright case of actual intent to hinder, delay, or defraud creditors.[40]


## C.  Disgorgement of Fees and Sanctions

The Marriage Law might presume that the Bethlehem home would be

marital property,[41] but it has nothing to do with the title to property being in an individual

spouse's name or in both spouses' names as tenants by the entirety.  The Hengst decision

cannot be read to stand all recording and title concepts on their heads by saying that all

property, even if in one person's name, could be deemed to be titled in two or more

parties' names whether as joint tenants, as tenants in common, or as tenants by the

entirety with no notice to any other person.  I have determined that the 2006 Deed from

Debtor alone to Debtor and her husband as tenants by the entirety was unlawful and a

fraudulent transfer.

Two questions remain:  First, does Mr. Lightner's advice and counsel to

---

[39]11 U.S.C. §548(a)(1)(B); 12 Pa. C.S.A. § 5105.

[40]11 U.S.C. §548(a)(1)(A); 12 Pa. C.S.A. §§ 5104(a)(1) & (b).

[41]As discussed above, such a presumption could only arise if the DelCorsos were in the
midst of domestic relations strife.

Debtor that she execute and record the 2006 Deed subject him to sanctions and

disgorgement of his fees?  Second, does Mr. Lightner's expressed beliefs that the

execution and recording of the 2006 Deed were proper counseling and appropriate pre-

filing exemption planning insulate him from disgorgement or sanctions?

The purpose of sanctions is to deter baseless or frivolous litigation.  In re

Crippen, 346 B.R. 115, 121 (Bankr. E.D. Pa. 2006), citing Cooter & Gell v. Hartmarx

Corp., 496 U.S. 384, 393 (1990).  Beyond that bare statement of the purpose of sanctions,

I must add that sanctions also help to maintain confidence and reasonable costs in the

American legal system generally, and in the Bankruptcy Courts more specifically, by

deterring overzealous counsel from raising baseless, frivolous claims and issues.  Courts

should not be diverted inappropriately from the true merits of a case to unreasonable and

false positions.

In this case seeking sanctions, I am obliged to determine the reasonableness

of legal conclusions set forth in a pleading or advanced in litigation by applying an

objective standard under the circumstances of each case.  Martin v. Brown, 63 F.3d 1252,

1264 (3d Cir. 1995).  Initially, I find that Mr. Lightner was totally incorrect in suggesting

that Debtor execute and record the 2006 Deed.  I must now determine the reasonableness

of Mr. Lightner's subjective belief that his advice was correct and appropriate.  I will

therefore examine the various facets and interplay of Mr. Lightner's approach to

34

ownership of the Bethlehem home and the 2006 Deed.

Federal Bankruptcy Rule 9011(b) provides, in pertinent part, as follows:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, –

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

*   *   *

Fed. R. Bankr. Proc. 9011(b).

Rule 9011(c) provides as follows:

If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to [certain procedural] conditions . . . , impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

Fed. R. Bankr. Proc. 9011(c).

I must weigh whether Mr. Lightner's legal position was unreasonable under Rule 9011(b)(2) by considering it from the perspective of a competent attorney. United States v. Stringfellow, 911 F.2d 225, 226 (9th Cir. 1990). Mr. Lightner, with his years of

experience in bankruptcy cases, is subject to a meaningful awareness of the basic tenets

of bankruptcy law set forth in the Bankruptcy Code and the decisions construing it.  More

importantly, his years of experience must lead him, when he confronts an issue that he has

not specifically dealt with,[42] to spend some time researching the viability of any course of

conduct that he might suggest to a client.

Mr. Lightner's last line of defense is, effectively, that he should not be

sanctioned because he believed that what he did was lawful and appropriate.  Mr.

Lightner insisted, at the October 18, 2007  hearing, that if he had had the opportunity to

litigate the Chapter 7 Trustee's claims against Debtor, he would have had a good chance

of success.[43]  As must be evident from my discussion above, however, he is woefully

misguided about his chance of successful litigation.  Debtor's transfer of the Bethlehem

home through the 2006 Deed is one of the grossest, law school examination examples of a

fraudulent transfer that one might see.  With this in mind, I will review the issues that

weigh on my decision whether to impose sanctions against Mr. Lightner.

Mr. Lightner (1) was aware that the mortgage lender who financed Debtor's

---

[42]As mentioned in footnote 42, below, Mr. Lightner acknowledged that he had never
litigated a fraudulent transfer case.

[43]I find no basis whatsoever for his confidence that he might have succeeded in the
litigation.  Mr. Lightner made this claim despite his frank acknowledgment in response to
questioning by counsel for the U.S. Trustee that he has never litigated a fraudulent transfer
action.

purchase of the Bethlehem home made the loan on condition that Debtor acquire the

property in her name alone; (2) counseled Debtor to execute and record the 2006 Deed

slightly over a week before filing Debtor's bankruptcy petition; (3) had previously shown

on Mr. DelCorso's Schedule A that he had no interest in the Bethlehem home; (4) had

previously obtained a bankruptcy discharge of all debt for Mr. DelCorso, including a debt

owed jointly with his wife that would have been paid if Mr. DelCorso had an ownership

interest in the Bethlehem home;[44] (5) prepared Debtor's statement of financial affairs,

including its paragraph 10, in which Debtor denied any transfer of property in the two

years preceding her bankruptcy; (6) prepared Debtor's Schedule A, which described the

Bethlehem home as owned with her husband as tenants by the entirety; (7) prepared

Debtor's Schedule D without designating that the mortgage on the Bethlehem home was

in Debtor's name alone; (8) failed to direct either or both of Debtor or Ms. DeWald, to

disclose the 2006 Deed to the Chapter 7 Trustee; (9) did not immediately tell the

DelCorsos, after the Trustee started the litigation against Debtor, that Debtor had a

legitimate defense to the Trustee's claims that the 2006 Deed was fraudulent; (10) had not

told Debtor in September 2006 that if the Trustee learned about the 2006 Deed and

pressed it, she might become obliged to pay all of her debts in full; (11) made no apparent

effort to research the potential fraudulent transfer issue, despite never having litigated a

---

[44]If the Bethlehem home had been disclosed as being owned by the DelCorsos as tenants
by the entirety, at least the Chase debt, which was listed as a joint debt, would have been paid by
Mr. DelCorso's Chapter 7 Trustee. Because his schedules included no real property, whether
owned individually or with his wife, the Chase debt was discharged without being paid.

37

fraudulent transfer case; and (12) now claims that the transfer of the Bethlehem home was appropriate, even though he cites no supporting cases whatsoever[45] and has no experience in litigating fraudulent transfer cases. Further, brief discussion about some of the above factors is warranted.

Factor number (1) above showed Mr. Lightner that the title in the Bethlehem home was unquestionably and expressly required to be in Debtor's name alone by Countrywide. The DelCorsos' personal belief that, the actual state of the title notwithstanding, they both owned the Bethlehem home falls to the side in the face of the unquestioned condition of sole title in Debtor. Mr. Lightner acknowledges (in Debtor's Schedule D) that the Countryside mortgage, which is in Debtor's name alone, is a valid lien on the Bethlehem home and therefore acknowledges that, at the settlement table, title was in Debtor alone. Mr. Lightner fails, however, to provide any description whatsoever of when, through what, or how ownership of the Bethlehem home shifted to the DelCorsos together as tenants by the entirety.

Factor numbers (3) and (4) reveal that Mr. Lightner maintained, in Mr. DelCorso's bankruptcy case, that Mr. DelCorso had no interest in the Bethlehem home.

---

[45]As discussed at some length above, Mr. Lightner does refer to a single case, Hengst v. Hengst, 420 A.2d 370 (Pa. 1980). He now appears to rely entirely on the Hengst case as his sole support for his position. But numerous logical absurdities pop up in any effort to extend the Hengst decision to this case. Any serious thought about the repercussions of applying Hengst to this case must show even a novice attorney that Hengst is simply inapplicable here.

Owning no interest in the Bethlehem home benefitted the discharge of all claims against

Mr. DelCorso's without paying any of them.  But when Debtor filed, he reversed course

completely and advised and counseled Debtor to declare that the Bethlehem home was

owned as tenants by the entirety.  He took two polar opposite, wholly inconsistent views

of title to the Bethlehem home to limit the payments to creditors in two different cases.

Factor numbers (5), (7), and (8) reveal Mr. Lightner's failure to disclose the

2006 Deed and his attempt to mislead the Chapter 7 Trustee.

Factor numbers (9) and (10) reveal that Mr. Lightner had approached the

2006 Deed as taking a chance on something that, if not uncovered by the Chapter 7

Trustee, would benefit his client.  These factors also lead me to infer that Mr. Lightner

was, at the very least, uncertain if his advice to Debtor was correct.

For all of the factors listed above, I find that Mr. Lightner knew or should

have known that the 2006 Deed was a fraudulent transfer.  He should not have advised

Debtor to proceed with the 2006 Deed and is culpable for sanctions for having done so.

39

# V.  CONCLUSION

Mr. Lightner has no reasonable legal support for his position that the transfer of the Bethlehem home effected by the 2006 Deed was lawful and not a fraudulent transfer.  Mr. Lightner sought no reasonable legal support for the position he advised Debtor to take.    Mr. Lightner made no reasonable attempt to determine the legitimacy of the transfer accomplished by the 2006 Deed.  Mr. Lightner tried to hide the 2006 Deed from the Chapter 7 Trustee.  Mr. Lightner, in Mr. DelCorso's prior bankruptcy, had declared that Mr. DelCorso had no interest in the Bethlehem home.

Yet, Mr. Lightner advised and counseled Debtor to transfer, through the 2006 Deed, the Bethlehem home on the eve of her bankruptcy and failed to disclose it to the Chapter 7 Trustee.  Under the circumstances of this case, I conclude that disgorgement of Mr. Lightner's fees of $1,155 and the imposition of an additional sanction of $95[46] is appropriate both to punish Mr. Lightner and to compensate Debtor for the absence of value of Mr. Lightner's services.  I further conclude that the disgorgement of fees and the sanction are appropriate to deter repetition of this or similar conduct both by Mr. Lightner and by other attorneys in the same or similar situations.

**Date: December 27, 2007**

---

[46]See footnote 2, above.

40